UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PETER GILHOOLY, | : | |
|    Plaintiff, | : | |
| | : | |
|      v. | : | Case No. 3:21-CV-140 (SVN) |
| | : | |
| ANGEL QUIROS, ET AL., | : | |
|    Defendants. | : | |

## **<u>INITIAL REVIEW ORDER – AMENDED COMPLAINT</u>**

Plaintiff Peter Gilhooly is incarcerated at MacDougall-Walker Correctional Institution ("MacDougall-Walker") in Suffield, Connecticut.  He initiated this action on February 3, 2021, by filing a complaint under 42 U.S.C. § 1983 against Department of Correction Commissioner Angel Quiros, Warden Robert Martin, Doctor Ingrid Feder, M.D., and Registered Nurses Amy Benoit, Casey Verito, Kayla, and Alex.  ECF No. 1.  He alleged that during his confinement at Corrigan-Radgowski Correctional Institution ("Corrigan-Radgowski") in 2020, Defendants were deliberately indifferent to his health and safety.  On September 21, 2021, the Court dismissed Plaintiff's Eighth Amendment claim that Defendants, in their individual capacities, were deliberately indifferent to Plaintiff's health by failing to implement or follow necessary COVID-19 protocols; Plaintiff's Eighth Amendment claim that Defendants, in their individual capacities, were deliberately indifferent to his asthma condition and related symptoms before and after he contracted COVID-19; and Plaintiff's requests seeking monetary damages and retrospective injunctive relief for violations of Plaintiff's Eighth Amendment rights by Defendants in their official capacities, which were barred by the Eleventh Amendment.  ECF No 10.  The Court permitted Plaintiff leave to file an amended complaint to correct the deficiencies supporting the dismissal of the Eighth Amendment claims asserted in the complaint.

On October 15, 2021, Plaintiff filed an amended complaint under 42 U.S.C. § 1983 against Commissioner Angel Quiros, Warden Robert Martin, Deputy Warden John Doe #1, Captain Dumas, Lieutenant Ocasio, Dr. Ingrid Feder, Registered Nurses Amy Benoit, Casey Verito, Kayla Lozado, Kara Phillips, and Registered Nurse/Health Services Review ("HSR") Coordinator Janine Brennan.  ECF No. 13.  For the reasons set forth below, the Court will dismiss the amended complaint in part and permit certain claims to proceed.

## I.      Standard of Review

Pursuant to 28 U.S.C. § 1915A(b), the Court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief."  *Id.*  This standard of review "appl[ies] to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid [a] filing fee."  *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004) (internal quotation marks and citation omitted).

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although detailed allegations are not required, a complaint must include enough facts "to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]'

devoid of 'further factual enhancement,'" does not meet the facial plausibility standard.  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

"*Pro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'"  *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).  However, notwithstanding this liberal interpretation, a *pro se* complaint will not survive dismissal unless the factual allegations meet the plausibility standard.  *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

## II.    FACTUAL BACKGROUND

The Amended Complaint sets forth the following alleged facts, which are accepted as true for purposes of this initial review.[1]  Plaintiff's allegations may be distilled into two categories: first, he alleges that he contracted COVID-19 while incarcerated because various prison officials placed him in an unsafe housing environment without regard to his preexisting medical condition; second, he alleges that prison officials were deliberately indifferent to his severe COVID-19 symptoms, which further exacerbated those symptoms.

Taking the latter, newer allegations first, Plaintiff states that he has been treated for asthma for most of his life and, prior to contracting COVID-19 while incarcerated, had only used one inhaler to alleviate his symptoms.  Am. Compl., ECF No. 13 ¶¶ 17-18.  After contracting COVID-19, he says, he has had to use two inhalers.  *Id.* ¶ 19.  He also claims that he was diagnosed with hypertension after contracting COVID-19.  *Id.* ¶ 20.  Additionally, Plaintiff

---

[1] *See Dehany v. Chagnon*, No. 3:17-cv-00308 (JAM), 2017 WL 2661624, at *3 (D. Conn. June 20, 2017) (for purposes of Section 1915A review, "[t]he Court must accept as true all factual matters alleged in a complaint").

claims that he has been given inadequate care with respect to several medical appointments that were cancelled or "not followed up on" and serious damage to his lung that was not properly treated. *Id.* ¶ 21-22. He further claims that "prisoner officials" and "medical staff" prevented him from getting adequate medical care because of "cost and/or discrimination, and [in] retaliation for complaints and grievances he filed against prison officials." *Id.* ¶ 23.

Plaintiff's Amended Complaint then elaborates on allegations from his original complaint. Again, the allegations in the Amended Complaint are taken as true for purposes of this initial review. Specifically, Plaintiff alleges that on March 26, 2020, at Corrigan-Radgowski, an inmate named Watkins and his cellmate were housed in the E-Block at Corrigan with Plaintiff. *Id.* ¶ 26. Watkins and his cellmate exhibited symptoms of COVID-19. *Id.* On March 28, 2020, Plaintiff began to feel sick with a bad headache, body aches, a sore throat, loss of taste and smell, difficulty breathing, and intermittent chest pain. *Id.* ¶ 24. Plaintiff complained to Nurses Benoit, Verito, Phillips, and Lozado about his symptoms, but they did not immediately test him to determine whether he had contracted COVID-19. *Id.* ¶ 25. Nurses Phillips and Benoit routinely informed Plaintiff that his symptoms suggested that he suffered from only a cold. *Id.* ¶ 29

Shortly before March 30, 2020, medical officials tested inmates in Plaintiff's housing unit, including Watkins and his cellmate, for COVID-19. *Id.* ¶ 28. On March 30, 2020, Watkins and his cellmate "were reported COVID-19 positive." *Id.* Prison officials did not move Watkins or his cellmate out of the housing unit. *Id.* ¶ 30. Watkins and his cellmate continued to take showers in the same unit as non-COVID infected inmates and participated in recreational programs with other inmates. *Id.*

Plaintiff was a laundry worker and a "tier man" in the housing unit. *Id.* ¶ 31. He

collected other inmates' laundry to be washed and cleaned various hard surfaces in the housing unit. *Id.* Prison officials did not provide him with any protective equipment to use when he cleaned the unit. *Id.* Nor did officials engage in mass COVID-19 testing of Plaintiff's housing unit or quarantine inmates who tested positive or COVID-19. *Id.*

Plaintiff next claims to have been exposed to COVID-19 during conversations with an unnamed correctional officer and an unnamed nurse. *Id.* ¶ 32. He states that there were rumors that both of these unnamed persons were "placed on sick leave for COVID reason[s]." *Id.*

On April 1, 2020, an unnamed nurse took the temperature of each inmate in Plaintiff's housing unit. *Id.* ¶ 33. Plaintiff informed her of his symptoms including headache, body aches, severe sore throat, and loss of taste and smell, and she replied that Plaintiff "probably had a head cold." *Id.* She suggested that he could "write to medical," but medical staff members would not be able to do anything for a sore throat. *Id.*

Between March and May 2020, Plaintiff wrote and spoke to Nurses Phillips, Benoit, Lozada, and Verito about his health problems, including asthma, bronchitis, and difficulty breathing. *Id.* ¶ 34. He also spoke to Nurses Verito and Lozada about his health concerns during their tours of his unit. *Id.* ¶ 35. Various nurses placed Plaintiff on the sick call list on several occasions but later removed Plaintiff's name from the list, disregarded Plaintiff's requests for treatment, and verbally harassed Plaintiff to appease correctional officers who did not like Plaintiff. *Id.* ¶ 36. Plaintiff also alleges that he spoke with Unit Managers Captain Dumas and Lieutenant Ocasio about the nurses' conduct, who "promised to look into" the conduct, but they did not. *Id.*

On April 5, 2020, Plaintiff's mother emailed Commissioner Cook regarding her son's health. *Id.* ¶ 42. Commissioner Cook informed Plaintiff's mother that all staff members had

been made aware of her son's underlying medical conditions. *Id.* Plaintiff's wife and mother also communicated with prison officials on the telephone about Plaintiff's medical condition. *Id.* ¶ 46.

On April 8, 2020, prison officials transferred Watkins and his cellmate to the Northern Correctional Institution ("Northern"), where the Department of Correction was quarantining inmates who were COVID-19 positive. However, around April 11 or 12, 2020, they were returned to E-Block in Corrigan-Radgowski, where Plaintiff resided. *Id.* ¶ 38-39. Four other inmates were moved into E-Block for quarantine and housed in the same unit as inmates who had not tested positive for COVID-19, including Plaintiff. *Id.*

On May 20, 2020, Plaintiff and several other inmates in E-Block were tested for COVID-19. *Id.* ¶ 40. Plaintiff was told he tested positive on May 23, 2020, and that he would be moved to H-Block for quarantine. *Id.* ¶ 40. When he arrived in H-Block, Plaintiff was housed in the same cell as Watkins, who had received a second positive COVID-19 test. *Id.* ¶ 43. Plaintiff and the other inmates who had been quarantined in H-Block were not allowed to use the shower or phones for three days. *Id.*

On May 27, 2020, a medical provider tested Plaintiff's blood for blood clots, allegedly because of the long wait between March and May for "adequate [COVID-19] treatment, which was never administered by medical staff." *Id.* ¶ 44. Shortly after this visit, a nurse whom Plaintiff claims requested anonymity informed Plaintiff that he had not been assessed by Dr. Feder because she only visited Corrigan-Radgowski once a week and was "always intoxicated." *Id.* ¶ 45.

On May 31, 2020, an unnamed nurse took Plaintiff's vital signs and noted an elevated pulse at 100 beats per minute. *Id.* ¶ 47. Plaintiff told her he was stressed due to testing positive

for COVID-19, which had exacerbated his asthma.  *Id.*  The nurse told Plaintiff that she had informed her supervisor "Kara," sent messages to Dr. Feder, and placed Plaintiff on the sick call list to be seen.  *Id.*

Plaintiff was returned to E-Block on June 3, 2020,[2] but he alleges that it was not safe because it was not sanitized or scoured.  *Id.* ¶ 48.  Plaintiff returned to his laundry duties, with only a cloth mask for protection.  *Id.*  Plaintiff was not given any sanitary supplies or sanitizers, and other inmates were given watered-down sanitizer.  *Id.* ¶ 49.

On June 14, 2020, Plaintiff again wrote to medical services about his trouble breathing and his asthma.  *Id.* ¶ 50.  On June 26, 2020, an unnamed nurse called Plaintiff to the medical department to be assessed.  *Id.*  During the appointment, Plaintiff asked the nurse to refer him for a chest x-ray.  *Id.*  The nurse stated that he should have gotten an x-ray when he first tested positive for COVID-19 due to his history of asthma.  *Id.*  The nurse informed Plaintiff that she would put him on a "must see" list to be examined by Dr. Feder.  *Id.*  Plaintiff underwent x-rays of his lungs but Dr. Feder did not assess or examine him.  *Id.* ¶¶ 50, 52.  On August 21, 2020, a nurse informed Plaintiff that the x-rays of his lungs "were good."  *Id.* ¶ 52.  Plaintiff alleges that, as a result of the prolonged delays in x-rays and treatment, he has "gray cloud in his lungs," and "abnormal sound that is called 'rhonchi' in his lower lung, lower back pain when breathing, high blood pressure, headaches, intermittent chest pain, and difficulty breathing.  *Id.*  His requests for various tests and examinations allegedly fell "on deaf ears."  *Id.*

Between June and September 2020, Plaintiff states he wrote and spoke to Warden Martin, Deputy Warden Doe, Unit Managers Captain Dumas and Lieutenant Ocasio and Nurses Benoit,

---

[2] The amended complaint references the date of "June 3, 2021," but the Court construes this as a typographical error.

Verito, Phillips, and Lozado regarding his medical issues and need for treatment.  *Id.* ¶ 51.  He received no treatment in response to his requests.  *Id.*

On October 6, 2020, Plaintiff again wrote to the medical department asking for a refill of his inhaler and to see a doctor for his shortness of breath, wheezing, asthma, and marks on his left arm.  *Id.* ¶ 53.  A nurse, named but not a defendant in this action, responded that Plaintiff's inhaler order was "currently active," but suggested that Plaintiff request an inhaler from the nurse who would be dispensing medications to him.  *Id.*  Over the next several days, Plaintiff asked various nurses about his "active" inhaler order but they were unaware of the order.  *Id.*

On October 16, 2020, Plaintiff received a note from Dr. Feder, which indicated that his blood pressure was high, but not dangerously so, and could be due to his having contracted COVID-19.  *Id.* ¶ 54.  Dr. Feder informed Plaintiff that she would prescribe an anti-hypertensive medication if his blood pressure remained elevated after thirty days.  *Id.*  Plaintiff heard nothing further regarding his need for anti-hypertensive medication.  *Id.*

On October 23, 2020, an unnamed nurse called Plaintiff to the medical department to assess his asthma condition.  *Id.* ¶ 55.  During the appointment, Plaintiff told the nurse about everything that had occurred since he had contracted COVID, including the facts that his inhaler was not relieving his asthma symptoms, his lower back and chest pain were worse, and he was suffering from headaches more frequently.  *Id.*  The nurse ordered another chest x-ray, which showed a spot on one of Plaintiff's lungs.  *Id.*

Later that day, Dr. Feder examined Plaintiff and concluded that his symptoms were due to prolonged exposure to COVID-19.  *Id.* ¶ 56.  She prescribed Prednisone and a steroid inhaler called Flovent because she could hear something in his left middle/lower lung.  *Id.*  She also prescribed a hydrocortisone cream to alleviate the marks on his left arm.  *Id.*  She indicated that

she would follow-up with him in two weeks to determine whether the Prednisone and the topical skin cream had been effective in relieving his symptoms. *Id.* Dr. Feder never called Plaintiff for the follow-up appointment. *Id.*

Plaintiff subsequently wrote to the medical department to find out why he had not received his prescribed steroid inhaler. *Id.* ¶ 57. A medical provider informed Plaintiff that there was no prescription for the inhaler but there was a prescription for Prednisone. *Id.*

On November 9, 2020, Plaintiff wrote a request to medical services about why he had not been scheduled for a two-week follow-up appointment with Dr. Feder. *Id.* ¶ 58. Nurse Lozada told him his medical request had been marked as "complete" even though he had not been seen. *Id.* Plaintiff concludes that someone, possibly Nurse Lozada or Nurse Verito, removed him from the sick call list because otherwise his request would not have been marked as "complete." *Id.* ¶¶ 58-59, 76. Nurse Lozada informed Plaintiff that his name had been placed back on the "prescriber (medical) sick call" list. *Id.* Dr. Feder did not call Plaintiff for a follow-up appointment. *Id.* ¶ 58-59.

Between September 2020 and November 2020, Plaintiff filed multiple medical and administrative grievances. *Id.* ¶ 63. Grievances Plaintiff filed in September and October 2020 went missing. *Id.* ¶ 64. Nurse Brennan, the Heath Service Grievance Coordinator, and Counselor King, visited Plaintiff to discuss the grievances, and Counselor King told Plaintiff that his main issue was "medical not custody." *Id.* ¶ 64. Plaintiff contends that Nurse/Coordinator Brennan "deliberately threw out" his medical grievances or returned them without disposition, to prevent him from exhausting his administrative remedies and, in turn, suing for violation of his rights. *Id.* ¶ 65-66. On November 17, and December 7, 2020, Brennan upheld at least two of Plaintiff's medical grievances. *Id.* ¶ 71.

On December 15, 2020, Dr. Feder examined Plaintiff and indicated that she would refer him for an ultrasound and bloodwork. *Id.* ¶¶ 69-70. Plaintiff subsequently wrote to a nurse about an appointment for an ultrasound, but the nurse indicated that an appointment had not been scheduled. *Id.*

Plaintiff alleges that although he received some treatment, he did not receive treatment in full for his COVID-19 infection, high blood pressure, and asthma, leaving him with serious medical issues. *Id.* ¶ 73. He claims that he was left untreated because "prison officials wished to cover up their deeds." *Id.*

On February 22, 2021, prison officials at Corrigan-Radgowski transferred Plaintiff to MacDougall-Walker. *Id.* ¶ 79. At MacDougall-Walker, Plaintiff suffered from wheezing, shortness of breath, difficulty breathing, fatigue, and pain in his lungs and back. *Id.* The only treatment that he has received is a prescription for an inhaler. *Id.*

## III.   DISCUSSION

Plaintiff alleges the following counts:

**Count One:**   Violations of his Eighth and Fourteenth Amendment rights by Commissioner Quiros, Warden Robert Martin, Deputy Warden Doe #1, Captain Dumas, and Lieutenant Ocasio for placing Plaintiff in an unsafe housing environment, failing to move Plaintiff from the unsafe environment, and being deliberately indifferent to his health.

**Count Two:**  Violations of his Eighth and Fourteenth Amendment rights by Dr. Feder, Nurses Phillips, Benoit, Verito, Lozada, and Brennan for being deliberately indifferent to his serious medical needs.

**Count Three:**  Violations of his First Amendment rights by Nurses Brennan, Lozada, Phillips, Warden Martin, and Deputy Warden John Doe #1, for acting in concert to block,

prevent, and/or stop Plaintiff from exhaustion of administrative remedies and, thus, impede his ability to file suit.  The Court also interprets Count Three as raising a Fourteenth Amendment due process claim, despite that one is not explicitly stated.

**Count Four:**   Violations of his Eighth and Fourteenth Amendment rights by Commissioner Quiros, Warden Martin, Deputy Warden Doe, Captain Dumas, Lieutenant Ocasio, Dr. Feder, Nurses Phillips, Benoit, Verito, Lozada, and Brennan for being deliberately indifferent to his serious medical needs and failing to supervise and train nursing staff.

**Relief Sought.**   Plaintiff seeks: (1) a declaratory judgment that Defendants' actions violated the First, Eighth, and Fourteenth Amendments of the U.S. Constitution; (2) an injunction restraining Defendants from refusing or denying Plaintiff adequate medical care and blocking him from exhausting the grievance process; (3) compensatory damages, punitive damages, costs, and attorney's fees.  Plaintiff does not specify whether Defendants are each sued in their individual or official capacities.

Plaintiff's claims seeking compensatory and punitive damages from Defendants in their official capacities for violating his federal constitutional rights are barred by the Eleventh Amendment.  *See Kentucky v. Graham*, 473 U.S. 159 (1985) (Eleventh Amendment, which protects the state from suits for monetary relief, also protects state officials sued for damages in their official capacity); *Quern v. Jordan*, 440 U.S. 332, 342 (1979) (Section 1983 does not override a state's Eleventh Amendment immunity).  Accordingly, all claims for relief against Defendants in their official capacities are dismissed under 28 U.S.C. § 1915A(b)(2).

The Court proceeds to analyze the claims brought against Defendants in their individual capacities.

### A. Viability of Counts

#### 1. Count One

In Count One, Plaintiff has alleged violations of his Eighth and Fourteenth Amendment rights by Commissioner Quiros, Warden Robert Martin, Deputy Warden Doe #1, Captain Dumas, and Lieutenant Ocasio for placing Plaintiff in an unsafe housing environment, failing to move Plaintiff from the unsafe environment, and for being deliberately indifferent to his serious medical needs.  **For the reasons discussed below, Plaintiff's Fourteenth Amendment claim fails against all Defendants; and his Eighth Amendment claim fails against Commissioner Quiros, Warden Martin, and Deputy Warden Doe #1.  The Court will allow the Eighth Amendment claim against Captain Dumas and Lieutenant Ocasio to proceed for further development of the record.**

> a. Fourteenth Amendment Claim against Commissioner Quiros, Warden Robert Martin, Deputy Warden Doe #1, Captain Dumas, and Lieutenant Ocasio

The Supreme Court has held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotation marks and citation omitted). Because the Cruel and Unusual Punishment Clause of the Eighth Amendment provides protection against deliberate indifference to a prisoner's safety and health, the Court will analyze Plaintiff's allegations regarding Defendants' failure to protect him from contracting COVID-19 and provide him with care for his medical symptoms and conditions under that Amendment rather than under the Due Process Clause of the Fourteenth Amendment.  *See, e.g.*, *Sacramento v. Lewis*, 523 U.S. 833, 842–43 (1998) ("[I]f a constitutional

claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." (internal quotation marks omitted)).   Therefore, the Fourteenth Amendment due process claims related to the Defendants' deliberate indifference to Plaintiff's health and safety are dismissed, and the Court will consider whether those claims proceed under the Eighth Amendment.  *See* 28 U.S.C. § 1915A(b)(1).

> b.  Eighth Amendment Claim Against Quiros, Martin, and Doe

A plaintiff seeking to recover money damages under § 1983 from a defendant in an individual capacity must demonstrate "the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit held that "after *Iqbal*, there is no special rule for supervisory liability," and instead, "[t]he violation must be established against the supervisory official directly."  *Id.* at 618.  Therefore, a government or prison official is not personally involved in the violation of a plaintiff's constitutional rights simply "by reason of [the official's] supervision of others who committed the violation."  *Id.* at 619.  Rather, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676).  Once a plaintiff properly alleges that a defendant was personally involved in a constitutional deprivation, the plaintiff "must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation."  *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).

Plaintiff alleges that, before he tested positive for COVID-19, either his mother or his wife contacted former Commissioner Cook and his successor, Commissioner Quiros.   Quiros

was not appointed to the position of interim Commissioner of the Department of Correction until July 2020.[3]   ECF No. 13 ¶ 42.   Thus, Plaintiff's allegation that his wife and mother contacted Quiros in his capacity as Commissioner of the Department of Correction prior to Plaintiff's testing positive for COVID-19 on May 23, 2020, is not plausible.

Plaintiff asserts further that on an unspecified date, he sent a request to Commissioner Quiros via interdepartmental mail but did not receive a response to the request.   *Id.* ¶ 46. Plaintiff does not describe the nature of the written request that he sent to Commissioner Quiros or when he sent the request.   The allegation regarding a request sent to Quiros via interdepartmental mail on an unspecified date does not demonstrate that Commissioner Quiros was directly involved in the conditions of Plaintiff's confinement or the other Defendants' deliberate indifference to Plaintiff's medical needs.   **Because Plaintiff has not plausibly asserted the direct involvement of Commissioner Quiros, the Eighth Amendment claims asserted against Defendant Quiros are dismissed.**   *See* 28 U.S.C. § 1915A(b)(1).

Plaintiff's allegations against Warden Martin and Deputy Warden Doe are similarly insufficient.   Warden Martin and Deputy Warden Doe are not among the prison officials Plaintiff's mother and his wife allegedly contacted regarding Plaintiff's medical issues.   *See* ECF No. 13, ¶¶ 41-42.   Plaintiff alleges that Nurse Brennan and another unidentified nurse are designated by the warden to process medical grievances, *id.* ¶ 61, but he alleges no personal involvement by the warden or deputy warden in the alleged disregard and improper processing of

---

[3] *See* Connecticut State Department of Correction, https://portal.ct.gov/DOC (last visited December 29, 2021); (Press Release, Office of Governor Ned Lamont – September 2, 2020 - Appointing Angel Quiros, who had been serving as interim Commissioner since July 2020, to Serve as Commissioner of the Department of Correction); https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/09-2020/Governor-Lamont-Appoints-Angel-Quiros-To-Serve-as-Commissioner-of-the-Department-of-Correction.

his grievances.   Furthermore, Plaintiff does not allege that Warden Martin or Deputy Warden Doe were in E-Block regularly or otherwise involved themselves in the specific, allegedly unsafe conditions of Plaintiff's housing unit, as he alleges with Captain Dumas and Lieutenant Ocasio. **Because Plaintiff has not plausibly asserted the direct involvement of Warden Martin or Deputy Warden Doe in the deliberate indifference to his health concerning his housing placement, the Eighth Amendment claims asserted against Defendants Martin and Doe asserted in Count One are dismissed.** *See* 28 U.S.C. § 1915A(b)(1).

               c.   Eighth Amendment Claims Against Captain Dumas and Lieutenant Ocasio

Plaintiff claims that Captain Dumas and Lieutenant Ocasio were deliberately indifferent to his serious medical needs by placing him in an unsafe housing environment and refusing to move him from that environment during the COVID-19 pandemic.  Specifically, Plaintiff alleges that Captain Dumas and Lieutenant Ocasio were in E-Block almost every day (wearing masks) and that several inmates, including Plaintiff, told them about the unsafe conditions there.  ECF No. 13 at ¶ 37.  According to Plaintiff, neither Captain Dumas nor Lieutenant Ocasio did anything to make E-Block safer for Plaintiff.  *Id.*  Plaintiff also alleges that he reported the removal of his name from the sick call list to Captain Dumas and Lieutenant Ocasio and that they both promised to "look into it," but they never did.  *Id.* ¶ 36.

To state a claim of deliberate indifference to health or safety under the Eighth Amendment, an inmate must allege: (1) the objective component, that the plaintiff is "incarcerated under conditions posing a substantial risk of serious harm," and (2) the subjective component, that the prison official acted with a "sufficiently culpable state of mind," which in "prison-conditions cases" is "one of deliberate indifference to inmate health or safety[.]".  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted).

To meet the subjective component, a plaintiff must assert facts plausibly indicating the prison officials knew that the plaintiff faced a substantial risk to their health or safety and disregarded that risk by failing to take corrective action.  *Id.* at 834, 837.

It is undisputed that COVID-19 "is a highly dangerous disease that poses a significant risk of severe illness and death[.]"  *Martinez-Brooks v. Easter*, No. 3:20-cv-00569 (MPS), 2020 WL 2405350, at *21 (D. Conn. 2020) (finding prisoners' claims during a COVID-19 outbreak satisfied the objective component for a deliberate indifference claim).  Plaintiff alleges that Captain Dumas and Lieutenant Ocasio were aware of the unsafe nature of E-Block due to the COVID-19 positive inmates housed there and failed to take actions to make it safer.  At the initial review stage, these allegations are sufficient.  **The Eighth Amendment claim of Count One shall proceed against Defendants Dumas and Ocasio in their individual capacities.**

### 2.    Count Two

In Count Two, Plaintiff alleges that Dr. Feder, Nurses Phillips, Benoit, Verito, Lozada, and Brennan violated his Eighth and Fourteenth Amendment rights by being deliberately indifferent to his serious medical needs.

For the reasons as discussed above, the Court will consider Count Two under the Eighth Amendment, and the Court dismisses the Fourteenth Amendment claim with respect to Count Two.

The Eighth Amendment prohibits deliberate indifference by medical providers and prison officials to an inmate's serious medical and dental needs.  *See Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976) (noting that deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.").  As discussed

above, to state a claim of deliberate indifference, an inmate must meet two elements, one objective and one subjective.

In the context of a plaintiff's medical need or condition, the first element requires a plaintiff to allege facts that demonstrate that his medical need or condition is objectively serious. *See Hill v. Curcione*, 657 F.3d 116, 122–23 (2d Cir. 2011) (a serious medical need contemplates "a condition of urgency" such as "one that may produce death, degeneration, or extreme pain" (internal quotation marks and citation omitted)).  In determining whether a medical condition is serious, a court considers whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted).

To meet the subjective element of an Eighth Amendment deliberate indifference claim involving a medical need or condition, an inmate must allege that the prison official or medical provider was actually aware that their actions or inactions would create a substantial risk of serious harm to the inmate.  *See Hill*, 657 F.3d at 122 (citation omitted).  Mere negligent conduct, however, does not constitute deliberate indifference.  *Id.* at 123 ("'a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'") (quoting *Estelle*, 429 U.S. at 106).

Plaintiff alleges that, prior to contracting COVID-19 in May 2020, he suffered from and had been treated for asthma.  After contracting COVID-19, he experienced difficulty breathing and shortness of breath, back and chest pain, headaches, other symptoms that he attributed to bronchitis, and hypertension.  An x-ray of his lungs taken in October 2020 showed a spot on one

of his lungs.  Plaintiff further contends that from late March until late May 2020, Dr. Feder, Nurses Benoit, Verito, Lozado, Phillips, and Nurse/HSR Coordinator Brennan refused to timely treat or assess his symptoms that suggested that he may have contracted COVID-19; failed or refused to take an x-ray his lungs immediately following his COVID-19 diagnosis in May 2020; and refused to examine him or assess his symptoms or send him for further testing after the initial x-rays.  He asserts that from June to September 2020, he made Dr. Feder, Nurses Benoit, Verito, Lozado, Phillips, and Nurse/HSR Coordinator Brennan, Warden Martin, and Deputy Warden Doe #1 aware of his medical symptoms either orally or in writing but none of these individuals took steps to treat him, to arrange for treatment, or to assess his symptoms.  He alleges further that during the period from October through December 2020, Dr. Feder failed to schedule follow-up appointments, medical testing, or diagnostic procedures.

These allegations are sufficient at this stage of the proceedings to state a plausible claim that Plaintiff suffered from chronic symptoms indicating a serious medical condition, which was exacerbated when Plaintiff contracted COVID-19.  These allegations are likewise sufficient to state a plausible claim that Dr. Feder, Nurses Benoit, Verito, Lozado, Phillips, and Nurse/Coordinator Brennan either ignored or refused to treat him for these symptoms, failed to arrange for follow-up testing and examinations, or failed to arrange for the provision of medical treatment for these symptoms.  **The Eighth Amendment claim of Count Two will proceed against Defendants Feder, Benoit, Verito, Lozado, Phillips, and Brennan, in their individual capacities, for further development of the record.**

### 3.    Count Three

In Count Three, Plaintiff alleges violations of his First Amendment rights by Nurses Brennan, Lozada, Phillips, Deputy Warden John Doe #1, and Warden Martin for acting in

concert to block, prevent, and/or stop Plaintiff from exhaustion of administrative remedies through improper processing, denial, and destruction of his grievance forms.  He alleges that, through those actions, Defendants have impeded his access to the courts.  The Court interprets these allegations as raising both First Amendment and Fourteenth Amendment due process claims, despite that Plaintiff has not explicitly cited the Fourteenth Amendment.

The Fourteenth Amendment's protection against deprivation of "liberty" has been interpreted to protect two sources of liberty interests: those arising from the Due Process Clause itself; and those arising from state law.  *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989).  The "standard analysis under [the Due Process Clause] proceeds in two steps: We first ask whether there exists a liberty . . . interest of which a person has been deprived, and if so we asl whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

Thus, state prison regulations can create a liberty interest of which an inmate must not be deprived absent due process.  *See Sandin v. Conner*, 515 U.S. 472, 483-84, 486 (1995) (ultimately concluding that prison regulation governing "segregated confinement" did not create a liberty interest under the Due Process Clause); *Kentucky Dept. of Corrections*, 490 U.S. at 460 (ultimately concluding that prison regulation governing visitation did not create a liberty interest under the Due Process Clause).  However, a state prison regulation creates a constitutionally protected liberty interest only when an inmate's restraint in violation of that prison regulation either "exceed[s] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force" or "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin*, 515 U.S. at 484.

In the Second Circuit, a plaintiff may typically assert an atypical and significant hardship

to support deprivation of a liberty interest arising from a prison regulation only in the context of disciplinary confinement. *See Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000) (applying *Sandin* to a claim that a prison regulation governing disciplinary confinement violated an inmate's Fourteenth Amendment rights); *Taylor v. Rodriguez*, 238 F.3d 188, 194 (2d Cir. 2001) ("In recognizing that states may create liberty interests, the Supreme Court has, in the context of prisoner rights, limited those interests to freedom from restraint that 'imposes atypical and significant hardship[.]") (quoting *Sandin*, 515 U.S. at 484).

To that end, courts in the Second Circuit have regularly concluded that state grievance procedures do not give rise to constitutionally protected due process rights to have those grievance procedures followed by prison officials. *See, e.g.*, *Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (summary order) (noting that state policy regarding grievance procedures in state prison did not "create federally protected due process entitlements to [the] specific state-mandated procedures [for resolving such grievances].") (citation and internal quotation marks omitted); *Brown v. Graham*, 470 F. App'x 11, 13 (2d Cir. 2012) (summary order) ("[The plaintiff's] argument that he has a federally-protected liberty interest in the state's compliance with its own prison grievance procedures is meritless.") (citation omitted); *Garcia v. Semple*, No. 3:18-cv-1226 (SRU), 2019 WL 5597771, at *15 (D. Conn. Oct. 30, 2019) ("[A]llegations that a prison official violated the procedures set forth in a state's administrative remedy program that is applicable to prisoner grievances do not state a claim of a violation of an inmate's constitutional rights.") (collecting district court cases). Accordingly, Plaintiff's allegations that Nurse/Coordinator Brennan failed or refused to investigate or properly process his Level 1 medical grievances and grievance appeals in violation of the Department of Correction's administrative and medical grievance procedures do not state a claim under the Due Process

Clause of the Fourteenth Amendment.

With respect to the actions of Warden Martin, Deputy Warden Doe, and Nurses Lozada and Phillips, even assuming a due process violation related to processing of grievances was cognizable, Plaintiff's allegations that these Defendants violated his due process rights are lacking.  As discussed above, Warden Martin and Deputy Warden Doe, as supervisors, cannot be liable unless they were personally involved.  *See Tangreti*, 983 F.3d at 618-19.  Plaintiff states no such allegations.  Plaintiff also makes insufficient allegations as to Nurse Lozada's and Nurse Phillips' roles in the alleged violations; he alleges only that Nurse Phillips told him that there was an "issue" in the way medical grievances are processed, *see* ECF No.1 3 at ¶ 68, but does not claim she or Nurse Lozada improperly processed grievances.

Furthermore, the fact that Plaintiff may not have been able to properly exhaust all available grievance procedures under Administrative Directives 8.9 or 9.6 would not preclude him from seeking redress for his claims in this Court.  *See* 42 U.S.C. § 1997e(a) (requiring prisoners to exhaust administrative remedies only to the extent that the remedies are "*available*") (emphasis added); *Baltas v. Rivera*, No. 3:19-cv-1043 (MPS), 2019 WL 3944435, at *10–11 (D. Conn. Aug. 21, 2019) ("If prison officials 'thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation' the grievance procedure would be unavailable and the inmate would be able to proceed to federal court.") (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016)).  Thus, Plaintiff has not stated a plausible First Amendment claim for denial of access to courts or deprivation of a right to seek redress of grievances.  **The Fourteenth Amendment due process claim and First Amendment denial of access to courts claim asserted against Defendants Brennan, Lozada, Phillips, Doe #1, and Warden Martin are dismissed.**  *See* 28 U.S.C. § 1915A(b)(1).

###### 4.     Count Four

Count Four appears to largely restate Count Two's Eighth and Fourteenth Amendment claims for deliberate indifference to Plaintiff's serious medical needs, but adds as defendants Commissioner Quiros, Warden Marden, Deputy Warden Doe, Captain Dumas, and Lieutenant Ocasio.  While Plaintiff incorporates only certain paragraphs of his amended complaint into Counts Two and and Three, he has incorporated paragraphs 2-130 of the amended complaint into Count Four.  Because of this, the Court interprets Count Four as covering *both* the conduct regarding Plaintiff's alleged placement in an unsafe housing environment and Plaintiff's allegedly inadequate medical treatment.  For the reasons explained below, the Court dismisses Count Four.

As discussed above, the Court the Fourteenth Amendment claim in Count Four cannot survive, and the Court considers Count Four under the Eighth Amendment.

As discussed above, Plaintiff's allegations are insufficient to state an Eighth Amendment claim against Commissioner Quiros, Warden Martin, and Deputy Warden Doe because they do not allege direct participation in housing Plaintiff or treating his medical conditions.  *See Tangreti*, 983 F.3d at 618 ("a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'") (quoting *Iqbal*, 556 U.S. at 676).

Additionally, because there are insufficient allegations in the amended complaint to implicate Captain Dumas and Lieutenant Ocasio in the events surrounding Plaintiff's medical treatment, the Court dismisses Count Four's Eighth Amendment claim against those Defendants with respect to his medical treatment.  In addition, because there are insufficient allegations in the amended complaint to implicate Dr. Feder and Nurses Phillips, Benoit, Casey, Verito,

Lozada, and Brennan in the events surrounding the safety of Plaintiff's housing conditions, the Court dismisses Count Four's Eighth Amendment claim against those Defendants with respect to his housing conditions.

Thus, the remainder of Count Four raises an Eighth Amendment claim alleging (1) unsafe housing conditions against Captain Dumas and Lieutenant Ocasio, and (2) inadequate medical treatment against Dr. Feder and Nurses Phillips, Benoit, Casey, Verito, Lozada, and Brennan. However, these allegations are entirely duplicative of Plaintiff's Eighth Amendment claims raised in Counts One and Two, respectively. Accordingly, the Court dismisses the remainder of Count Four as duplicative of the claims otherwise permitted to proceed. *See Brown v. Plansky*, 24 F. App'x 26, 28 (2d Cir. 2001) (summary order) (holding that district court properly dismissed duplicative claims because, "[a]s part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit.") (citation and internal quotation marks omitted); *Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Or., Inc.*, 156 F. Supp. 3d 348, 362 (E.D.N.Y. 2016) ("Duplicative claims shall be dismissed when they are based on identical conduct and seek the same relief."); *Abreu v. Travers*, No. 9:15-CV-540 (MAD/ATB), 2015 WL 10741194 at *4 (N.D.N.Y. Sept. 14, 2015) ("When conducting a review under 28 U.S.C. §§ 1915(e)(2) and 1915A, the Court may also consider whether the claims asserted by the plaintiff are duplicative of claims asserted in another action against the same defendants."); *Cooper v. Cook*, No. 3:19-CV-1794 (JAM), 2020 WL 1923233 at *5 (D. Conn. Apr. 21, 2020) (dismissing claim "as duplicative" because it did "nothing more than restate" plaintiff's other claim asserted in the same action).

**In sum, Count Four is dismissed.** *See* 28 U.S.C. § 1915A(b)(1).

**B.     Claims for Relief**

**1.   Declaratory Relief**

Plaintiff seeks a declaration that the defendants violated his federal constitutional rights. ECF No. 13 at 31.  The Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past."  *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993); *see also Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young* ... to claims for retrospective relief.").

A declaration that Defendants violated Plaintiff's First, Eighth, and Fourteenth Amendment rights during his confinement at Corrigan-Radgowski cannot be properly characterized as "prospective" because Plaintiff does not allege how such relief would remedy any future constitutional violations by the defendants. **The request for declaratory relief is dismissed.**  *See* 28 U.S.C. § 1915A(b)(1).

**2.   Injunctive Relief**

Plaintiff seeks injunctive relief in the form of an order directing Defendants to provide him with medical care, including an ultrasound, a CT Scan, medication, and an assessment by a specialist.  He also seeks orders directing Defendants to refrain from placing him in a housing unit with other inmates who have tested positive or COVID-19 and to refrain from interfering with his attempts to exhaust available prison administrative remedies.  ECF No. 13 at 31.

An inmate's requests for prospective injunctive relief from correctional or medical staff in connection with conditions of confinement at a particular correctional institution become moot when the inmate is discharged from prison, is transferred to a different institution, or has received the relief requested.  *See Booker v. Graham*, 974 F.3d 101, 107–08 (2d Cir. 2020) ("'In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and

injunctive relief against officials of that facility.'") (quoting *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006)); *Khalil v. Laird*, 353 F. App'x 620, 621 (2d Cir. 2009) ("When [the plaintiff] was released from prison, he no longer had a "continuing personal stake" in the outcome of this action, and his claims [for declaratory and injunctive relief for alleged violations of his constitutional rights] were rendered moot."); *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed").

Plaintiff is no longer confined at Corrigan-Radgowski.  He alleges that prison officials transferred him to MacDougall-Walker in February 2021.  Thus, the request seeking an order directing the Defendants sued in this case to provide or arrange for a medical evaluation, testing, and treatment, and the requests seeking orders prohibiting Defendants from obstructing Plaintiff's attempts to exhaust administrative remedies and from placing him in a housing unit that might be detrimental to his health, are moot.  **Accordingly, the requests for injunctive relief are dismissed.**  *See* 28 U.S.C. § 1915A(b)(1).

## ORDERS

The court enters the following orders:

**(1)**     All claims seeking monetary damages from Defendants in their official capacities for violations of his First, Eighth, and Fourteenth Amendment rights are **DISMISSED** under 28 U.S.C. § 1915A(b)(2).

**(2)**     All claims asserted against Commissioner Quiros, Warden Martin, and Deputy Doe #1 are **DISMISSED** under to 28 U.S.C. § 1915A(b)(1).  The Clerk is directed to terminate those Defendants from this action.

**(3)**     All claims for declaratory and injunctive relief are **DISMISSED** under 28 U.S.C.

§ 1915A(b)(1).

**(4)**     Count Three is **DISMISSED** against all Defendants under 28 U.S.C. §
1915A(b)(1).

**(5)**     Count Four is **DISMISSED** against all Defendants under 28 U.S.C. §
1915A(b)(1).

**(6)**     Count One's Eighth Amendment deliberate indifference to health and safety claim
will proceed against Defendants Dumas and Ocasio in their individual capacities,
and Count Two's Eighth Amendment deliberate indifference to medical needs
claim will proceed against Defendants Feder, Benoit, Verito, Lozado, Phillips,
and Brennan in their individual capacities.

**(7)**     The Clerk shall verify the current work addresses of Captain Dumas, Lieutenant
Ocasio, Dr. Ingrid Feder, Registered Nurse Amy Benoit, Registered Nurse Casey
Verito, Registered Nurse Kayla Lozado, Registered Nurse Kara Phillips, and
Registered Nurse/Coordinator Janine Brennan and mail a copy of the amended
complaint, this Order, and a waiver of service of process request packet to each
Defendant in his or her individual capacity at his or her confirmed address.  If any
Defendant fails to return the waiver request by the thirty-fifth (35th) day after the
Clerk mailed the packet, then the Clerk shall arrange for in-person service by the
U.S. Marshals Service and that Defendant shall be required to pay the costs of
such service in accordance with Federal Rule of Civil Procedure 4(d).

**(8)**     **Defendants shall file their response to the amended complaint, either an
answer or motion to dismiss, within sixty (60) days from the date the notice
of lawsuit and waiver of service of summons forms are mailed to them.**  If

Defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above.  They may also include any and all additional defenses permitted by the Federal Rules of Civil Procedure.

**(9)** Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this order, specifically **July 27, 2022.**  Discovery requests need not be filed with the court.

**(10)** All motions for summary judgment shall be filed within seven months (210 days) from the date of this order, specifically **August 29, 2022.**

**(11)** **If Plaintiff changes his address at any time during the litigation of this case, Local Rule 83.1(c)(2) provides that Plaintiff MUST notify the court.  Failure to do so can result in the dismissal of the case.**  Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice.  Plaintiff should also notify the Defendants or the attorney for Defendants of his new address.

**(12)** Plaintiff shall utilize the Prisoner Efiling Program when filing documents with the Court.  Plaintiff is advised that the Program may be used only to file documents with the Court.  Local Court Rule 5(f) provides that discovery requests are not to be filed with the court.  Therefore, discovery requests must be served on Defendants' counsel by regular mail.

**(13)** The Clerk shall immediately enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall send a copy of the Standing Order to the parties.

**(14)** The Clerk shall send a courtesy copy of the amended complaint and this order to the Connecticut Attorney General and to the Department of Correction Legal

Affairs Unit.

SO ORDERED at Hartford, Connecticut this 27th day of January, 2022.

_____/s/_____
Sarala V. Nagala
United States District Judge